UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Alichia M. Ford**

        **v.**                              **Case No.  04-CV-194-PB**

**Jo Anne B. Barnhart, Commissioner**
**Social Security Administration**


MEMORANDUM AND ORDER

        Alichia Ford applied for Disability Insurance Benefits

("DIB") on May 6, 2002.[1]  Ford alleged that she became disabled

on May 11, 2000 due to nerve changes and spinal cord damage

resulting from encephalomyelitis.[2]  Her application was denied on

July 30, 2002.  At Ford's request, an administrative hearing to

review the denial was held on May 1, 2003 in front of

Administrative Law Judge ("ALJ") Edward G. Hoban.  In a September

26, 2003 order, ALJ Hoban once again denied Ford benefits.  Ford

---

        [1]  Ford also applied for Supplemental Security Income
("SSI") payments on May 6, 2002, with a protective filing date of
March 21, 2002.

        [2]  Encephalomyelitis is an acute inflammation of the brain
and spinal cord.  Stedman's Medical Dictionary 507 (25th ed.
1990) ("Stedman's")

requested review of that decision, and on April 1, 2004, the
Appeals Council denied her request for further review, making the
ALJ's determination the final decision of the Commissioner.  See
20 C.F.R. § 404.981.  Ford now seeks reversal of the
Commissioner's decision.

## I. BACKGROUND[3]

### A.   Education and Work History

Alichia Ford was born on March 13, 1976, and was twenty-
seven years old when ALJ Hoban issued his decision.  She is a
high school graduate, and her past relevant work include jobs as
a jewelry assembly worker, a sales clerk for a florist and a
greeting card store, and an assistant manager of a shoe store.
Ford reportedly left her last job because of pain and stress.

### B.   Medical History

Ford was admitted to Dartmouth Hitchcock Memorial Hospital
on August 4, 1999 in an altered mental state with diffuse body
pain.  She was largely unresponsive to auditory and tactile

---

[3]  Unless otherwise noted, the Background facts are drawn
from the Joint Statement of Material Facts (Doc. No. 7) submitted
by the parties pursuant to Local Rule 9.

-2-

stimulus.  A magnetic resonance imaging ("MRI") of her brain taken the same day was essentially unremarkable, though an August 8 MRI that included images of her spinal cord showed high signals in the cervical spine.  Further, an August 5 electroencephalogram ("EEG") produced results consistent with encephalopathy.[4]  Based on these findings, Ford was diagnosed with meningoencephalitis[5] and was treated with intravenous antibiotic and antiviral medications, as well as steroid therapy.  Even after her mental state ultimately returned to normal, however, she continued to suffer from bilateral lower extremity weakness and diminished strength, which at times left her unable to walk.  Despite these infirmities, Ford made dramatic improvements in muscle strength while hospitalized, largely due to physical therapy and occupational conditioning.  Hence, she was "much improved" and walking independently on the parallel bars as well as transferring in and out of a wheelchair by the time she was discharged on August 13, 1999.

---

[4]  Encephalopathy is any degenerative disease of the brain. See Stedman's 508.

[5]  Meningoencephalitis is an inflammation of the brain and its membranes.  Stedman's 943.

-3-

Ford was examined by Dr. Alida Griffith at the Hitchcock Clinic on September 1, 1999. Dr. Griffith's treatment notes refer to an MRI revealing increased signal in the thoracic spine. Ford told Dr. Griffith that she was doing well at home and could walk without much difficulty, but that her left leg was still weak. Her physical examination was largely normal, except for 4/5 strength in the right lower extremity, a slight decrease in vibration sensitivity in the distal lower extremities, and a slightly unsteady tandem gait. Ford also reported urinary incontinence, and Dr. Griffith referred her for a urology consultation. Dr. Griffith instructed Ford to return for a follow-up in six months.

Instead, Ford returned to Dr. Griffith on October 10, 2000. Ford explained that she had been doing "pretty well" since being discharged from the hospital, but complained of an odd feeling in her legs, with sensitivity and dysethesia[6] to hot and cold temperatures. Ford also reported a jerking sensation and motion in her legs. A physical examination revealed 4/5 strength in her right hip flexor and knee extensor, and she complained of pain

---

[6] Dysethesia is a condition in which a disagreeable sensation is produced by ordinary stimuli. Stedman's 476.

-4-

with cold sensation below the knee, while warm stimulus felt like pressure.  Dr. Griffith opined that Ford's symptoms were the lingering effect of acute disseminated encephalomyelitis, although they could have been an unusual presentation of multiple sclerosis.  Ford reported ongoing urinary frequency, though she admitted that she had not followed up with Dr. Griffith's prior referral to a urologist.  Dr. Griffith gave her a trial dose of Neurontin for her dysesthesias and leg jerking and again referred her to a urologist.

Ford next saw Dr. Griffith on December 12, 2000.  She complained of urinary frequency, painful leg spasms, and difficulty sleeping.  The Neurontin had caused intolerable side effects, including drowsiness and dizziness.  A physical examination revealed that Ford's lower extremity strength was 5/5 and her sensation was intact, except for a small area of hypesthesia[7] on her left thigh.  Dr. Griffith believed Ford's symptoms were secondary to a static lesion of the thoracic spinal cord.  Although she again failed to keep Dr. Griffith's urology referral, Ford assured Dr. Griffith that she would see a

---

[7]  Hypesthesia is diminished sensitivity to stimulation. Stedman's 747.

urologist closer to her home.  Dr. Griffith prescribed Ditropan for spastic bladder and Baclofan as a muscle relaxant and antispastic agent.

Ford next sought medical care on July 17, 2002, after filing her application for disability benefits, when she was examined by Dr. Lawrence Jenkyn.  Dr. Jenkyn observed that Ford was not taking any medication for pain.  Upon examination, Ford had 5/5 strength in all four extremities, with increased tone in the lower extremities.  Although her sensation was intact, cold stimulus to her feet resulted in withdrawal responses due to burning pain that she experienced subjectively.  A mental status exam revealed normal mental status, speech and language functions, visual fields, and cranial nerves.  Her gait and station were normal.  Dr. Jenkyn believed that Ford was suffering from the chronic after-effects of encephalomyelitis.  He opined that her burning dysesthesias might respond to Baclofen, which "probably should be offered to her at some point."

Ford returned to Dr. Jenkyn for a follow-up neurological consultation on April 21, 2003.  She reported increasing difficulty with her right hand, which had caused her to drop things unpredictably.  She also reported that her lower extremity

-6-

pain and spasticity were "as bad as ever."  Ford stated that she
had tried several over-the-counter medications, but had never
taken the Baclofen that Dr. Jenkyn had prescribed.

Dr. Jenkyn referred Ford to psychologist Lewis Sussman on
March 26, 2003 for a clinical interview with psychometric
testing, in connection with her Social Security disability
appeal.  Ford told Dr. Sussman that physical activities such as
lifting and bending, staying in one position for an extended
period of time, and stress worsened her pain, but that she got
temporary relief from a hot bath or shower.  Ford estimated that
she got about four hours of non-restorative sleep each night and
awakened several times per night.  She noted that she was not
taking any prescription medications and complained of low energy
level and motivation, decreased appetite with weight loss, and
difficulty with her memory and concentration.  Ford attributed
this in part to a motor vehicle accident she was involved in when
she was 17 years old.  Ford described her mood as edgy,
irritable, and depressed, but denied that she was suicidal.

Dr. Sussman thus saw no evidence of abnormal thought process
or content.  He did not think Ford was suffering from a
psychological disability that would prevent her from returning to

-7-

work, but he did state that she would be a good candidate for behavioral pain management counseling.  He believed that she also needed medication for depression and sleep.  Although he performed no formal testing, he opined that Ford had some memory and attention problems, and thus recommended neuropsychological testing and counseling.

Ford's attorney referred her to industrial rehabilitation therapist Bradford Shedd for a Functional Capacity Evaluation ("FCE").  Shedd conducted this testing on March 26 and March 27, 2003 and issued his report on April 2, 2003.  He concluded that Ford's work capacity was for "full-time sedentary physical demand level, mostly seated."[8]  During the evaluation, Ford demonstrated sitting capacity in the range of 1 to 59 minutes, with an average of 16 minutes.  She showed a standing capacity within an 8 to 29 minute range, with an average of 17 minutes.  Shedd indicated that Ford could occasionally lift up to eight pounds, with a one-time maximum lift of 12 pounds.  He did not note any walking,

_____

[8]  Shedd's conclusions referenced the Department of Labor's definition of sedentary work as "requir[ing] sitting for more than six hours out of an eight-hour workday, lifting no more than 10 lbs. on an occasional basis, with possible frequent lifting of small objects weighing less than 10 lbs."

reaching, vision, or memory and attention limitations, but he indicated that Ford should avoid stooping and bending.  Effort screening tests revealed that Ford gave consistent effort throughout the testing, and thus the results gave a reasonable estimate of her work capacities.  Shedd recommended that she seek pain management counseling.

Ford underwent a neuropsycholgical examination at Dartmouth Medical Center on July 16, 2003.  Neuropsychologist Robert Roth conducted extensive intelligence, memory, motor function, and mood testing.  Ford's scores ranged from low average to high average.  Her language skills were all in the average or high average range, and her mood screening indicated moderate symptoms of depression, without suicidal ideation, and severe self-reported anxiety.

Dr. Roth concluded that Ford's overall intellectual functioning was in the average range.  He identified deficits in complex problem solving, with a mild relative weakness for cognitive flexibility.  Ford's other executive functions, including visual memory, memory for structured verbal information, attention, and fine motor speed and coordination, were intact.  Her test results were consistent with her history

of traumatic brain injury and encephalomyelitis.  Dr. Roth
recommended that Ford break down complex tasks into smaller, more
manageable pieces, and that she take notes and occasional short
breaks.

**C.   <u>Administrative Evidence</u>**

Ford filed a Disability Report with Social Security on April
10, 2002.  In that report, she indicated that she was able to
carry her 18-pound child to the car and back.  She noted that she
could not sit, stand, or walk for longer than 20 minutes, and
that she had difficulty climbing stairs and getting up after
bending over for too long.  She also reported that sustained
activity caused pain in her back and legs, and that her legs
tired very quickly.  Finally, she stated that on a good day her
concentration was "pretty good," but that she had trouble
concentrating if she was in pain.

Ford completed an Activities of Daily Living ("ADL")
questionnaire on May 23, 2002.  She reported cooking two times
per week and grocery shopping once per month.  She indicated that
she was able to clean and do laundry two or three times per week
with the help of a neighbor.  She also indicated that she left
the house twice per day, to drive her children to and from

-10-

school.

On July 25, 2002, Dr. Charles Meader, a state agency consultant physician, reviewed Ford's file and completed a Residual Functional Capacity ("RFC") assessment.  He determined that Ford retained the ability to occasionally lift up to 20 pounds and frequently lift up to ten pounds; that she could stand, walk, or sit for about six hours in an eight hour workday, and was otherwise unlimited in her ability to push or pull with her upper and lower extremities.  Dr. Meader also indicated that she was limited to only occasional postural actions such as balancing, stooping, kneeling, and crouching.  He found no manipulative, visual, communicative, or environmental limitations.  In support of his conclusions, Dr. Meader noted that Ford was able to drive, do some chores, and shop with assistance, and that she used no ambulatory device and did not require daily narcotic analgesics.

**D.   Ford's Testimony**

Ford, who was represented by counsel, testified at the May 1, 2003 hearing before ALJ Hoban.  There she explained that she had trouble doing housework because the motion irritated her back, and that she was further unable to cook or do dishes, lift

a gallon of milk without difficulty, or pick up her children, ages seven, five, and one.

Ford testified that Dr. Jenkyn told her that her encephalomyelitis had eaten away part of her spinal cord, causing nerve damage and resulting in back and leg pain.  She said her legs regularly "jumped," and occasionally would give out if she was standing.  Ford also reported that her right hand would sometimes "let go for no apparent reason."  She explained that she had pain every day, although some days were worse than others.  On a bad day, she reported having to lie down four or five times for 30 to 45 minutes each time, and that she had at least three bad days each week.

Ford also testified that she returned to her job as an assistant manager in the shoe store after her hospitalization in August 1999, but stopped working after several months because she could no longer do the job.  She explained, for example, that she was unable to kneel, reach, and move the shoe boxes as the job required, and that she was very tired and occasionally fell asleep while at work.  Ford then testified that she was unsure if she could do a full-time sedentary job, in part because she could not sit for longer than 20 minutes.

**E.    Vocational Expert's Testimony**

Vocational Expert ("VE") James Parker also testified at the hearing.  He explained that Ford's past work as an assistant manager at a shoe store would be classified as light work by the Dictionary of Occupational Titles, but as medium work based on her description of the job.  He testified that her work as a sales clerk was semi-skilled and ranged from light to medium and her work as a jewelry assembler was unskilled and ranged from sedentary to light.

The ALJ asked VE Parker to consider a hypothetical claimant with Ford's work history and physical capacity for light work, as set forth in Dr. Meader's RFC assessment.  VE Parker testified that such a claimant could perform Ford's past work as a sales clerk, but not her work at the shoe store.

Based on his examination of Ford's April 2, 2003 FCE, however, VE Parker testified that a claimant with all the limitations identified in that report could not perform any of Ford's past work.  Nevertheless, he stated that such a claimant could work as a surveillance system monitor, an order clerk, or a jewelry repairer.  After accounting for Ford's need to alternate between sitting and standing, VE Parker testified that such an

accommodation would reduce the number of available jobs in New Hampshire and nationally by approximately one-half.

Next, VE Parker stated that a claimant with the limitations testified to by Ford at the hearing, including her need to lie down for thirty to forty-five minutes, could not sustain any employment, including the three jobs he identified earlier.  VE Parker indicated that his testimony was consistent with the information in the Dictionary of Occupational Titles.

## II. **STANDARD OF REVIEW**

After a final decision by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the ALJ's decision.  42 U.S.C. § 405(g).  My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence.  Id.; see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving

-14-

conflicting evidence.  See Irlanda Ortiz, 955 F.2d at 769.  I
must uphold the ALJ's findings "if a reasonable mind, reviewing
the evidence in the record as a whole, could accept it as
adequate to support [the ALJ's] conclusion." Rodriguez v. Sec'y
of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The
ALJ's decision is thus supported by substantial evidence if it is
reasonable.

The ALJ's findings of fact are not conclusive, however,
"when derived by ignoring evidence, misapplying the law, or
judging matters entrusted to experts." Nguyen v. Chater, 172
F.3d 31, 35 (1st Cir. 1999).  If the Commissioner, through the
ALJ, has misapplied the law or failed to provide a fair hearing,
deference to the Commissioner's is not appropriate, and remand
for further development of the record may be necessary.  See
Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).  I apply
these standards to the arguments Ford raises in her appeal.

## III. DISCUSSION

The Social Security Act defines "disability" for the
purposes of Title II as the "inability to engage in substantial
gainful activity by reason of any medically determinable physical

-15-

or mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).
When evaluating whether a claimant is disabled due to a physical
or mental impairment, an ALJ's analysis is governed by a five-
step sequential evaluation process.  20 C.F.R. § 404.1520.  The
ALJ is required to consider the following issues when determining
if a claimant is disabled: (1) whether the claimant is engaged in
substantial gainful activity; (2) whether the claimant has a
severe impairment; (3) whether the impairment meets or equals a
listed impairment; (4) whether the impairment prevents or
prevented the claimant from performing past relevant work, and
(5) whether the impairment prevents or prevented the claimant
from doing any other work.  20 C.F.R. § 404.1520.  An affirmative
answer at one step leads to the next step in the analysis.  Id.
If the answer to any question other than (3) is negative, the
claimant is not disabled.  Id.  The claimant bears the burden on
the first four steps.  At Step Five, the burden shifts to the
Commissioner to show "that there are jobs in the national economy
that the claimant can perform."  20 C.F.R. § 416.920(f); Heggarty
v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991); see also Keating

-16-

v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir.
1988).  The Commissioner must show that the claimant's
limitations do not prevent her from engaging in substantial
gainful work, but need not show that the claimant could actually
find a job.  See Keating, 848 F.2d at 276.

Here, the ALJ determined at Step Five that Ford was not
entitled to benefits because he found Ford's "capacity for
sedentary work was substantially intact and has not been
compromised by any non-exertional limits."  Tr. 21 (Finding 13).
Hence, the ALJ concluded at Step Five that Ford "has the residual
functional capacity to perform substantially all of the full
range of sedentary work."  Tr. 21 (Finding 11).  Ford now argues
that the ALJ:  (1) failed to properly credit her subjective
complaints of disabling pain; (2) ignored the testimony of the
VE; (3) failed to consider the opinions of her treating
physicians; and (4) relied on a FCE without accounting for the
limitations and recommendations contained in the evaluation.  I
address each argument in turn.

## A.  **Ford's Subjective Pain Complaints**

As part his RFC assessment, the ALJ considered Ford's
subjective complaints of pain, as required, and found her to be

not fully credible.  Tr. 19.  He determined that based on her
activities of daily living and the medical evidence in the
record, she retained the functional capacity to perform
sedentary, simple, unskilled work.  Id.

The Social Security regulations state that a claimant's
subjective complaints of disabling pain, standing alone, are
insufficient to establish disability; there must also be
objective medical evidence of an impairment that reasonably could
produce the alleged symptoms.  See C.F.R. § 404.1529(a).  Where
the record does not contain objective medical evidence
corroborating the claimant's allegations as to the intensity,
persistence, or functionally limiting effects of her symptoms,
the ALJ must assess the credibility of those statements based on
the entire record.  See S.S.R. 96-7p.  In assessing credibility,
the ALJ may rely on the claimant's daily activities, the overall
consistency of the claimant's statements, and the claimant's
efforts to obtain and comply with medical treatment of the
allegedly disabling symptoms.  See id.

Here, the record contains evidence that Ford made
contradictory statements to the Social Security Administration at
different stages of her disability claim.  For example, on April

-18-

10, 2002, Ford told a Social Security interviewer that she could
carry her 18-pound child to the car and back.  By contrast, at
the hearing Ford testified that she was unable to pick up a
gallon of milk or lift her one year old child.  Inconsistent
reports are relevant to the ALJ's credibility determination and
it was appropriate for him to consider them.  See S.S.R. 96-7p
(explaining that "one strong indication of the credibility of an
individual's statements is their consistency, both internally and
with other information in the case record.")

Furthermore, the record reveals that Ford sought medical
treatment only sporadically and did not fully comply with her
physicians' treatment advice.  After Ford was discharged from the
hospital on August 13, 1999, she was examined by Dr. Griffith on
September 1, 1999 and then again on October 10 and December 12,
2000.  There is no evidence of any other treatment until July 17,
2002, when Ford was first examined by Dr. Jenkyn.[9]  She returned
to Dr. Jenkyn on April 21, 2003, and his note from that visit

---

[9]  In connection with her disability claim, Dr. Jenkyn
referred Ford to Dr. Sussman for psychometric testing and her
attorney referred her to Bradford Shedd for a functional capacity
evaluation.

-19-

Case 1:04-cv-00194-PB   Document 9   Filed 07/07/05   Page 20 of 27

references an October 9, 2002 office visit, but there are no treatment notes from that date.  Ford's final visit to a medical professional occurred on July 16, 2003 when she underwent a neuropsychological examination.

Likewise, Ford failed to follow up on two referrals to a urologist and she twice failed to take the Baclofen prescribed for her muscle spasms.[10]  The ALJ properly considered Ford's sporadic treatment history and her failure to comply with her doctors' recommendations when assessing her credibility.  See S.S.R. 96-7p (noting that "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").  Hence, the ALJ acted within his discretion in considering Ford's failure to obtain regular treatment and to comply with her physicians' directives in determining that her subjective complaints of pain were less than fully credible.

---

[10]  Ford started taking the Baclofen sometime between April 21, 2003 and May 1, 2003, the date of the administrative hearing. Tr. 40, 169.

Moreover, the ALJ properly relied on Ford's Activities of Daily Living questionnaire in assessing her credibility.  On her ADL, Ford indicated that she could clean, do laundry, and drive her children to and from school.  Ford nevertheless contends that the ALJ did not construe the ADL correctly.  To the contrary, the ALJ appropriately considered the ADL in the context of other evidence, including the fact that she had not been restricted from working by any treating source.  I thus conclude that the ALJ was acting within his discretion when he resolved these evidentiary conflicts against Ford.  See Irlanda Ortiz, 955 F.2d at 769.

## B.   **Testimony of the Vocational Expert**

Ford next argues that the ALJ ignored the VE's testimony that due to her impairments, she would not be able to perform any employment.  Specifically, she charges that the ALJ disregarded the VE's testimony that a claimant with the limitations testified to by Ford at the hearing, including her need to lie down for 30 to 45 minutes, could not sustain any employment, including the three jobs the VE had earlier identified.[11]  I disagree.  Because

---

[11]  Ford also argues that the ALJ improperly discounted the VE's testimony that one half of the jobs would be unavailable if

there was no medical evidence to support these limitations and the ALJ permissibly discounted Ford's subjective pain complaints, the ALJ was not required to credit, or even address this testimony in his decision.  See Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)(noting that "in order for a VE's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by outputs from the medical authorities.").

Ford further argues that the ALJ could not properly rely on the VE's testimony, because he indicated that he could not assess the impact of her memory and concentration problems without considering the results of neuropsychological testing.  Again, I disagree.  Even without the results of Ford's neuropsychological

---

the claimant needed to alternate between a seated and standing position.  This argument is without merit.  Even with this reduction, the total number of jobs was approximately 199,750 jobs nationally and 920 jobs regionally that Ford could perform despite her limited RFC.  This constitutes a "significant number" of jobs for the purpose of determining eligibility under the Act. See Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 193) (1,400 jobs are significant number); Hall v. Bowen, 837 F.2d 272, 275 (9th Cir. 1989)(1,350 jobs are significant number); Barker v. Sec'y of Health & Human Servs., 882 F.2d 1474, 1479 (9th Cir. 1989)(1,266 jobs fall within parameters of significant number); Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988)(500 jobs are significant number); Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987)(174 jobs are significant number).

tests, the VE testified that the three jobs he identified are "unskilled jobs . . . which would be simple tasks," and that Ford would only be precluded from performing these jobs if she was unable to execute "routine, repetitive, simple one step, two step jobs." Tr. 59. The July 2003 neuropsychological evaluation later confirmed that Ford is in fact able to perform simple, unskilled work. Accordingly, it was reasonable for the ALJ to conclude that the VE's testimony that a claimant with Ford's RFC could perform the approximately 199,750 national jobs and 920 regional jobs would not have been different had he been able to first consider the results of her neuropsychological evaluation. Hence, the ALJ properly evaluated the VE's testimony in concert with the other evidence in the record.

## C.   **The Opinions of Ford's Treating Physicians**

Ford's third argument is that the ALJ failed to consider the opinion of her treating physicians. This argument is without merit. Ford appears to assert that the ALJ should have accorded greater weight to the note in Dr. Jenkyn's file that "her lower extremity pain and spasticity has been as bad as ever." Ford is incorrect. The fact that Ford told Dr. Jenkyn that she was experiencing pain and the fact that he recorded her complaints in

his notes does not convert her subjective complaints of pain into medical opinion, thus entitling it to some measure of deference. See 20 C.F.R. §§ 404.1527(a)(2), 404.1527(d), 416.927(a)(2), 416.927(d).   Likewise, Ford's subjective complaints are not entitled to greater weight simply because they appear in her physician's notes.   See Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996)(noting that "[t]here is nothing objective about a doctor saying, without more, 'I observed my patient telling me that she was in pain.'").   The ALJ therefore properly evaluated the opinions of Ford's physicians.

D.    **The ALJ's Assessment of the Functional Capacity Evaluation**

    Ford's final argument is that in assessing her RFC, the ALJ relied on the FCE without accounting for the limitations and recommendations contained in the evaluation and thus based his decision on conjecture and unwarranted assumptions.   In particular, she charges that the FCE indicated a need for additional evaluations and information, including a neuropsychological evaluation and consideration of her pain and depression.   This argument is without merit.

    The ALJ determined that Ford retained the RFC to "lift up to 10 pounds occasionally consistent with sedentary work that is

performed primarily while sitting." Tr. 21 (Finding 7). He
further determined that "[s]he is limited from performing more
than simple, unskilled work." Id. This determination is in full
accord with the various tests and evaluations included in the
record and substantial evidence supports the ALJ's conclusion
that Ford could perform unskilled, sedentary work.

The Social Security regulations define unskilled work as
"work which needs little or no judgment to do simple duties that
can be learned on the job in a short period of time . . . a
person can usually learn to do the job in 30 days." 20 C.F.R. §§
404.1568(a), 416.968(a). Dr. Sussman, who performed a
psychological evaluation of Ford in March 2003, determined that
although she "appears to have some memory and attention
problems," Ford "does not have a psychological disability that
would prevent her return to work." Similarly, the July 16, 2003
neuropsychological testing revealed "deficits in *complex* problem
solving, verbal learning for noncontextual information and . . .
a *mild* relative weakness for cognitive flexibility." (Emphasis
added). Nevertheless, Ford scored in the superior and high
average range for memory functions and in the average range for
attention/concentration and executive functioning. Overall, Ford

-25-

scored in the average range of intellectual functioning.  These
evaluations support the ALJ's conclusion that despite the
cognitive deficits that he properly acknowledged, there is no
evidence that those deficits would prevent Ford from performing
unskilled work.

It was also reasonable for the ALJ to conclude that Ford
retained the ability to perform sedentary work.  According to the
Social Security regulations, "sedentary work represents a
significantly restricted range of work, and individuals with a
maximum sustained work capability limited to sedentary work have
very serious functional limitations."  20 C.F.R. part 404,
Subpart P, Appendix 2 § 200.00(h)(4).  Here, the Disability
Determination Services consultant physician who reviewed Ford's
file in July 2002 concluded that she retained the ability to
perform light work, which requires greater exertion than
sedentary work.  Furthermore, industrial rehabilitation therapist
Bradford Shedd, who conducted an extensive functional capacity
evaluation in March 2003, concluded that Ford retained the
ability to perform full-time sedentary work.  Hence, the ALJ's
conclusion that Ford is limited to sedentary work is consistent
with the various evaluations in the record and appropriately

-26-

acknowledged the serious limitations caused by her impairments.[12] I thus conclude that the ALJ's determination that Ford retained the RFC to perform unskilled, sedentary work is supported by substantial evidence.

### IV. <u>CONCLUSION</u>

Because I have determined that the ALJ's denial of Ford's benefits was supported by substantial evidence, I affirm the Commissioner's decision.  Accordingly, Ford's Motion for Summary Reversal (Doc. No. 5) is denied and the Commissioner's Motion for An Order Affirming the Decision of the Commissioner (Doc. No. 6) is granted.  The clerk shall enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

July 7, 2005

cc:  Michael C. Shklar, Esq.
     David L. Broderick, Esq.

---

[12]  Notably, not one of the physicians or psychologists who examined and treated Ford or reviewed her records concluded that her impairments were sufficiently disabling to preclude all work.

-27-